# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: SEPTEMBER 22, 2016
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2015-SC-000658-WC

FINAL

DATE 10/13/16 Kim Redman, DC

UNINSURED EMPLOYERS' FUND,
COMMONWEALTH OF KENTUCKY                                    APPELLANT


ON APPEAL FROM COURT OF APPEALS
V.     CASE NOS. 2014-CA-001758-WC AND 2014-CA-001794-WC
WORKERS' COMPENSATION NO. 04-00504


POPLAR BROOK DEVELOPMENT, LLC.;
BARBARA NEGROE; TIMOTHY HANNAH;
CALVIN BAKER; BRIAN TERRY;
HONORABLE J. LANDON OVERFIELD,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD                                 APPELLEES


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Appellant, Uninsured Employers' Fund, Commonwealth of Kentucky

("UEF"), appeals a Court of Appeals decision which affirmed the finding that

Appellees, Poplar Brook Development, LLC ("PBD"), Barbara Negroe, and Calvin

Baker were not responsible to pay for Timothy Hannah's workers'

compensation award. The Court of Appeals also held that Hannah did not

have to reimburse temporary total disability ("TTD") benefits paid to him after

he reached maximum medical improvement ("MMI") based on the terms of an

agreed order he entered into with the UEF and Terry. The UEF argues that both of these findings were erroneous. For the below stated reasons we affirm.

PBD was a limited liability company formed by Terry, Negroe, and Robert Tobiason to develop a subdivision in the Elizabethtown, Kentucky area. All three of them were engineers at General Electric ("GE"). PBD purchased land and installed infrastructure so that lots could be sold in the subdivision.

Negroe was on assignment for GE in Mexico when she learned she was being transferred back to Louisville. She purchased a lot at cost from PBD in order to build a family home. Negroe was able to purchase the lot at cost due to being a partner in PBD. Negroe then hired Terry to be the project manager. The project manager agreement entered into between Negroe and Terry stated that he was the "signing member of Poplar Brook Development, LLC." Terry opened up an account with a local lumber store under PBD's name to purchase materials for the construction. Terry then hired workers, including Baker, to assist with construction. Baker in turn recruited Hannah to help frame the house at the rate of ten dollars an hour. Hannah previously performed work for PBD constructing its infrastructure. No workers' compensation insurance was obtained for the project, even though when Negroe obtained the building permit it indicated that coverage must be maintained. Negroe ultimately fired Terry as project manager and took a more hands on role regarding the house construction.

On February 27, 2004, Hannah fell from a ladder while he was working on the deck of Negroe's house. Hannah fell into a hole and experienced a pop

2

and pain in the middle of his back to his tail bone. He later experienced pain in his right ankle due to blood clots. On March 10, 2004, Hannah filed a Form 101 alleging he sustained a compression fracture of his lumbar spine. The Form 101 listed Baker, Terry, PBD, and the UEF as parties. By this time Terry had declared bankruptcy and had left the Elizabethtown area.

The claim was bifurcated to determine the status of Hannah's employment and his average weekly wage. The ALJ determined that Hannah was an employee and that Terry was acting as his employer either by contract or by favor to Negroe. Because Terry did not maintain workers' compensation insurance, the UEF was found responsible for the payment of Hannah's benefits. Hannah's average weekly wage was found to be $400.

On December 21, 2004, the ALJ approved an agreed order among the UEF, Hannah, and Terry, which recognized that Terry was in default of paying TTD benefits and medical benefits. The agreement provided that the UEF would pay TTD benefits to Hannah in the amount of $266.66 per week from the date of the accident until "terminated by the order of the [ALJ]." The UEF also agreed to pay any medical expenses necessary for the treatment of Hannah's work-related injury until he reached MMI. The claim was placed in abeyance until Hannah reached MMI.

In July 2006, the ALJ ordered the parties to file a status report of Hannah's condition and to explain why the claim should not be returned to the active docket. Hannah filed a timely status report stating that he had not reached MMI and was continuing to receive TTD benefits. The UEF filed a

3

report by Dr. David Shraberg following an independent neuropsychiatric evaluation of Hannah. Dr. Shraberg stated that Hannah had been released to work, but continued to complain of pain. Dr. Shraberg noted that Hannah was being treated by pain management specialist, Dr. Rinkoo Aggrawal, and was receiving "fairly massive amounts of narcotics." Dr. Shraberg disagreed with Dr. Aggrawal's apparent belief that Hannah suffered from a traumatic brain injury as a result of his fall. Dr. Shraberg believed that Hannah reached MMI well before his evaluation and was suffering the effects of "massive narcotization." He suggested that Hannah be taken off of the pain medications and return to work.

Despite this report, no motion to remove the claim from abeyance was filed and Hannah continued to submit status reports indicating he had not reached MMI. The UEF continued to pay TTD and medical benefits.

On July 7, 2009, the UEF filed the report of Dr. Timothy Kriss, a neurosurgery specialist, who conducted an IME of Hannah on May 18, 2009. He noted that Hannah did not complain of back pain and that his lumbar spine was normal. Dr. Kriss examined an MRI scan of Hannah taken on February 28, 2004, and concluded that Hannah suffered from an "indentation" in the margin of the L1 cortex instead of a true compression fracture. Dr. Kriss concluded it had healed and was asymptomatic. He believed that any complaints Hannah had regarding pain in his left thigh, or numbness or tingling would resolve with weight loss. Dr. Kriss did not believe Hannah

4

suffered any traumatic brain injury and suggested that he be weaned off any narcotic medication.

Dr. Kriss performed a second evaluation of Hannah on September 12, 2012, where he found that Hannah had reached MMI on February 27, 2005. Dr. Kriss repeated his medical findings from his first evaluation. However, Hannah continued to file regular status reports stating he had not reached MMI. The UEF continued to pay TTD and medical benefits.

In July 2011, the UEF filed a motion to join Negroe as a party. The motion was granted, and Negroe filed a motion to have the claim returned to the active docket. She argued that the UEF had a good faith basis to terminate payment of TTD benefits to Hannah six years earlier. The UEF then filed liens against Negroe's Hardin County real estate, including her personal home.

In October 2012, Negroe filed a motion to terminate the payment of Hannah's TTD benefits. She submitted Dr. Kriss's independent medical examinations from May 2009 and September 2012 in support of her motion. The ALJ, on October 19, 2012, terminated the payment of Hannah's TTD benefits.

After a hearing, the ALJ issued an opinion, award, and order in April 2014. He again found that Hannah was an employee of Terry at the time of the work-related injury. Thus, Negroe, Baker, and PBD were not Hannah's employer and since there was no workers' compensation insurance, the UEF was responsible to pay all benefits. The ALJ further found that Hannah suffered a 5% functional impairment rating from the compression fracture. He

5

then adopted Dr. Kriss's finding that Hannah reached MMI on February 27, 2005. Therefore, Hannah's entitlement to TTD ended on that date, and the ALJ awarded the UEF a dollar-for-dollar credit against Hannah's permanent partial disability ("PPD") award for any overpayment of TTD made after that date. The ALJ also found that Hannah's continued use of narcotics was unreasonable and not compensable. A petition for reconsideration filed by Hannah was denied.

The Board affirmed the ALJ's opinion, award, and order, but vacated and remanded only for the ALJ to consider whether Hannah was entitled to an additional 1% impairment rating due to a pinched nerve in his left thigh. The Board also ordered the ALJ to award PPD benefits from the date of injury with payment of those benefits to be suspended during any period when TTD was paid. The Board agreed that Negroe, Baker, and PBD were not Hannah's employers and that Negroe and PBD did not have up-the-ladder liability. Both Hannah and the UEF filed an appeal to the Court of Appeals.

The Court of Appeals affirmed in part, vacated in part, and remanded the matter to the ALJ. The Court of Appeals agreed with the ALJ that Terry was Hannah's employer and that PBD and its partners did not have up-the-ladder liability. The Court of Appeals also affirmed the finding that Hannah had reached MMI on February 27, 2005, but disagreed with the ALJ's finding that the UEF was entitled for a dollar-for-dollar credit of any overpayment of TTD benefits from that date. The Court of Appeals found that since the agreed order stated that the ALJ had to enter an order to terminate the UEF's payment

6

of TTD benefits to Hannah, and no such order had been entered, the UEF was not entitled to discontinue payment of the benefits until that order was entered, October 19, 2012. Thus, the Court of Appeals held that the correct date the dollar-for-dollar credit ran from was October 19, 2012. This appeal followed.

The Board's review in this matter was limited to determining whether the evidence is sufficient to support the ALJ's findings, or if the evidence compels a different result. *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687 (Ky. 1992). Further, the function of the Court of Appeals is to "correct the Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Id.* at 687-88. Finally, review by this Court "is to address new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude." *Id.* The ALJ, as fact-finder, has the sole discretion to judge the credibility of testimony and weight of evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418 (Ky. 1985).

The UEF's first argument is that Negroe, Baker, and PBD are responsible to pay Hannah's workers' compensation benefits under KRS 342.610(2). KRS 342.610(2), the up-the-ladder statute, states:

> (1) Every employer subject to this Chapter shall be liable for compensation for injury, occupational disease, or death without regard to fault as a cause of the injury, occupational disease, or death.
> (2) A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of

7

compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter. Any contractor or his or her carrier who shall become liable for such compensation may recover the amount of such compensation paid and necessary expenses from the subcontractor primarily liable therefor. A person who contracts with another:

> (a) To have work performed consisting of the removal, excavation, or drilling of soil, rock, or mineral, or the cutting or removal of timber from land; or
> (b) To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person shall for the purposes of this section be deemed a contractor, and such other person a subcontractor. This subsection shall not apply to the owner of lessee of land principally used for agricultural.

*General Electric Co. v. Cain*, 236 S.W.3d 579, 588 (Ky. 2007), states:

> Work of a kind that is a 'regular or recurrent part of the work of the trade, business, occupation, or profession' of an owner does not mean work that is beneficial or incidental to the owner's business or that it is necessary to enable the owner to continue in business, improve or expand its business, or remain or become more competitive in the market. It is work that is customary, usual, or normal to the particular business (including work assumed by contract or required by law) or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar business would normally perform or be expected to perform with employees.

The UEF argues that PBD and Negroe are up-the-ladder employers and are responsible for Hannah's workers' compensation benefits because the development of a subdivision includes the construction of houses. Thus, the UEF argues that the construction of houses is a regular or recurrent part of the work of the trade, business, occupation, or profession that PBD and its investors were involved in. The UEF cites to the fact that the contract entered

8

into between Terry and Negroe stated he was the manager of PBD and opened an account in PBD's name to purchase lumber for the construction of Negroe's house. Additionally, the UEF notes that Terry took profits from the construction of Negroe's house and reinvested it into PBD. We disagree with the UEF's argument.

There is no evidence that PBD was in the regular and recurrent business of constructing houses. There is also no evidence that the construction of houses was customary or normal to PBD's business. Instead, PBD only developed a subdivision in which it would sell lots to individuals to build their own houses. Further, there is no evidence Negroe planned to build any other houses in the development. The house Negroe was building was to be a home for her family and not for investment purposes. The ALJ's findings are supported by substantial evidence and shall not be disturbed.

The UEF's second argument is that KRS 342.700(2) attaches up-the-ladder liability to the defendants because they acted as contractors and sub-contractors. That statute states in pertinent part:

> (1) Whenever an injury for which compensation is payable under this Chapter has been sustained under circumstances creating in some other person than the employer a legal liability to pay damages, the injured employee may either claim compensation or proceed at law by civil action against the other person to recover damages, or proceed both against the employer for compensation and the other person to recover damages, but he shall not collect from both . . .
> (2) A principal contractor, intermediate, or subcontractor shall be liable for compensation to any employee injured while in the employ of any one (1) of his intermediate or subcontractors and

9

> engaged upon the subject matter of the contract, to the same extent as the immediate employer . . . This subjection shall apply only in cases where the injury occurred on, in, or about the premises on which the principal contractor has undertaken to execute work or which are under his control otherwise or management.

The UEF believes PBD, Negroe, and Baker are bound as up-the-ladder employees because the agreement between Negroe and Terry to construct her house bound the members of the development group. However, there is little evidence that Terry was authorized by PBD to construct houses on its behalf. The evidence indicates that PBD was organized only to develop a subdivision and sell building lots. There is also no indication that any of the money Terry received for building Negroe's house was required to be placed in PBD accounts. While Terry voluntarily invested some proceeds into PBD, there is no evidence he was required to do so. The ALJ did not err by finding that Terry was Hannah's employer and the other defendants did not share up-the-ladder liability for paying his benefits.

We also note that the UEF argues that Negroe acted as a general contractor of the construction of her house, and therefore is responsible under KRS 342.700(2) to pay for Hannah's benefits. However, the record does not support this conclusion. Negroe did not supervise the work being completed at her house until the end of construction after Terry was fired. She was living in Mexico when construction began and was only acting and making decisions a prospective homeowner would make. She did not make direct payments to the individuals building her house, did not provide tools or materials to any of the

subcontractors, and did not control or direct their work. The ALJ did not err by finding that Negroe is not responsible for the payment of Hannah's workers' compensation.

The UEF's final argument is that the Court of Appeals erred by finding it is not entitled to a dollar-for-dollar credit for the TTD it paid Hannah after the date it was determined he reached MMI, February 27, 2005. The UEF argues that while the agreed order did state that TTD benefits were to be paid until the ALJ entered an order ending such payments, there is no authority for TTD benefits to be paid after MMI was reached. We disagree.

KRS 342.0011(11)(a) provides that TTD is "the condition of an employee who has not reached [MMI] from an injury and has not reached a level of improvement that would permit a return to employment." Thus, in a normal claim, once Hannah reached MMI, he would no longer be entitled to TTD benefits. However, the parties agreed that Hannah would receive TTD benefits until the ALJ issued an order stopping those benefits. Thus, Hannah was entitled to TTD benefits, by agreement of the parties, until the ALJ rendered his order on October 19, 2012 terminating those benefits. While payment of TTD benefits after that date could have constituted overpayment against which the UEF could claim a credit, payment of TTD benefits before that date did not constitute an overpayment and no credit is available.

Thus, for the above stated reasons, we affirm the decision of the Court of Appeals.

All sitting. All concur.

11

COUNSEL FOR APPELLANT,
UNINSURED EMPLOYERS' FUND,
COMMONWEALTH OF KENTUCKY:

Charles Davis Batson


COUNSEL FOR APPELLEE,
POPLAR BROOK DEVELOPMENT, LLC.:

Matthew C. Hess


COUNSEL FOR APPELLEE,
BARBARA NEGROE:

Brent Dye


COUNSEL FOR APPELLEE,
TIMOTHY HANNAH:

Larry Duane Ashlock


COUNSEL FOR APPELLEE,
CALVIN BAKER:

Not represented by counsel


COUNSEL FOR APPELLEE,
BRIAN TERRY:

Not represented by counsel